# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DAVID ESCALERA, *individually and on behalf of all others similarly situated*, | CIVIL ACTION NO. |
| Plaintiff, | |
| v. | |
| KNORR-BREMSE AG; KNORR BRAKE COMPANY LLC; NEW YORK AIR BRAKE LLC; WESTINGHOUSE AIR BRAKE TECHNOLOGIES CORPORATION; FAIVELEY TRANSPORT, S.A.; FAIVELEY TRANSPORT NORTH AMERICA INC.; and DOES 1-20, | **COMPLAINT – CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |
| Defendants. | |

# TABLE OF CONTENTS

**Page**

I.      SUMMARY OF THE ACTION ................................................................. 1

I.      JURISDICTION AND VENUE .............................................................. 2

II.     THE PARTIES ....................................................................................... 2

        A.    Plaintiff ..................................................................................... 2

        B.    Defendants ................................................................................. 3

        C.    Unnamed Co-Conspirators ........................................................ 4

III.    CLASS ACTION ALLEGATIONS ....................................................... 5

IV.     FACTUAL ALLEGATIONS ................................................................. 7

        A.    Trade and Commerce ................................................................. 7

        B.    Competition for Employees in the Rail Industry ..................... 7

        C.    Defendants and Their Co-Conspirators Entered Into Ongoing Agreements
              Not to Hire Each Other's Employees ...................................... 11

              1.    Wabtec – Knorr Agreements ......................................... 11

              2.    Knorr – Faiveley Agreement ........................................ 13

              3.    Wabtec – Faiveley Agreement ...................................... 14

        D.    The Agreement Among Defendants and Their Co-Conspirators Was
              Concealed From All Members of the Proposed Class, Including Plaintiff
              Escalera. .................................................................................. 15

        E.    Defendants' Conspiracy Suppressed Wages of Plaintiff Escalera and the
              Proposed Class, and Suppressed Their Mobility. ................... 16

FIRST CLAIM FOR RELIEF (Violation Of The Sherman Act, § 1) ....................... 18

PRAYER FOR RELIEF ............................................................................................. 19

JURY DEMAND ......................................................................................................... 21

1607824.1

Plaintiff David Escalera, individually and on behalf of a class of similarly situated individuals, hereby states and alleges the following against Defendants Knorr-Bremse AG ("Knorr"); Knorr Brake Company LLC ("Knorr Brake"); New York Air Brake LLC ("N.Y. Air Brake"); Westinghouse Air Brake Technologies Corporation ("Wabtec"); Faiveley Transport, S.A. ("Faiveley"); Faiveley Transport North America Inc. ("Faiveley North America"); and DOES 1-20 (collectively, "Defendants"):

## I.     **SUMMARY OF THE ACTION**

1.     This class action challenges an illegal conspiracy among Knorr, Knorr Brake, N.Y. Air Brake, Wabtec, Faiveley, Faiveley North America, and others to suppress the compensation of each company's employees.   Without the knowledge or consent of their employees, Defendants and senior executives at these companies entered into express agreements to eliminate or reduce competition among them for skilled labor.  This conspiracy consists of at least three agreements—between Wabtec and Knorr Brake, between Knorr Brake and Faiveley North America, and between Wabtec and Faiveley North America—that each company would not hire or attempt to hire employees from the other company without prior consent from that company (the "Conspiracy").

2.     The intended and actual effect of this Conspiracy is to suppress employee compensation, and to impose unlawful restrictions on employee mobility.  During the relevant period, Knorr, Wabtec, and Faiveley were the three largest rail equipment suppliers in the world and direct competitors.  Their employees possessed skills that were particularly valuable to each other, and so their no-poach agreements were an effective means of reducing competition for employees and suppressing employee pay below competitive levels.

3.      Defendants' Conspiracy restrained trade and is *per se* unlawful under federal law. Plaintiff Escalera seeks injunctive relief and damages for violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

**I.      JURISDICTION AND VENUE**

4.      Plaintiff Escalera brings this action to recover damages and obtain injunctive relief, including treble damages, costs of suit, and reasonable attorneys' fees arising from Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

5.      The Court has subject matter jurisdiction pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26) and 28 U.S.C. §§ 1331 and 1337.

6.      Venue is proper in this judicial district pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22) and 28 U.S.C. § 1391(b), (c), and (d) because a substantial part of the events giving rise to Plaintiff's claims occurred in this district, and a substantial portion of the affected interstate trade and commerce was carried out in this district.

7.      Defendants are subject to the jurisdiction of this Court because, *inter alia*, each Defendant: (a) transacted business throughout the United States, including in this District; (b) participated in an illegal Conspiracy throughout the United States, including in this District; (c) had substantial contacts with the United States, including in this District; and/or (d) was engaged in an illegal Conspiracy that was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

**II.      THE PARTIES**

    **A.      Plaintiff**

8.      Plaintiff David Escalera is a citizen and resident of the State of Rhode Island.

9.     Plaintiff was employed by Defendant Wabtec as a Field Services Support Engineer, from approximately July 2011 to January 2015.  Plaintiff was injured in his business or property by reason of the violations alleged herein.

**B.    Defendants**

10.     Defendant Knorr is a privately-owned German company with its headquarters in Munich, Germany.  Knorr is a global leader in the development, manufacture, and sale of rail and commercial vehicle equipment.  In 2017, Knorr had annual revenues of approximately $7.7 billion.  Knorr holds several wholly-owned subsidiaries in the United States.

11.     Defendant Knorr Brake is a Delaware corporation with its headquarters in Westminster, Maryland.  It manufactures train control, braking, and door equipment used on passenger rail vehicles.  Knorr Brake is a wholly-owned subsidiary of Knorr.

12.     Defendant N.Y. Air Brake is a Delaware corporation with its headquarters in Watertown, New York.  It manufactures railway air brakes and other rail equipment used on freight trains.  N.Y. Air Brake is a wholly-owned subsidiary of Knorr.

13.     Defendant Wabtec is a Delaware corporation headquartered in Wilmerding, Pennsylvania.  With over 100 subsidiaries, Wabtec is the world's largest provider of rail equipment and services with global sales of $3.9 billion in 2017.  It is an industry leader in the freight and passenger rail segments of the rail industry.  Wabtec Passenger Transit is a business unit of Wabtec that develops, manufactures, and sells rail equipment and services for passenger rail applications.  It is based in Spartanburg, South Carolina.  Wabtec Global Services is a business unit of Wabtec that offers maintenance, repair, and support services.  It has several locations throughout the United States.

1607824.1

14.    Defendant Faiveley had been a French société anonyme based in Gennevilliers, France.  On November 30, 2016, Wabtec acquired Faiveley, making Faiveley a wholly-owned subsidiary of Wabtec.  Before the acquisition, Faiveley was the world's third-largest rail equipment supplier behind Wabtec and Knorr.  Faiveley had employees in 24 countries, including at six U.S. locations.   It developed, manufactured, and sold passenger and freight rail equipment to customers in Europe, Asia, and North America, including the United States, with revenues of approximately €1.2 billion in 2016.

15.    Defendant Faiveley North America was a wholly-owned subsidiary of Faiveley and a New York corporation headquartered in Greenville, South Carolina.  In the United States, Faiveley conducted business primarily through Faiveley North America.  Certain Faiveley and Faiveley North America recruiting activities conducted prior to its acquisition by Wabtec are at issue in this Complaint.

        **C.**     **Unnamed Co-Conspirators**

16.    Plaintiff Escalera alleges on information and belief that DOES 1-20, inclusive, were co-conspirators with other Defendants in the violations alleged in this Complaint and performed acts and made statements in furtherance thereof.  DOES 1-20 are predecessors, successors, subsidiaries, corporate officers, members of the boards of directors, or senior officials of Defendants.  Plaintiff is presently unaware of the true names and identities of those defendants sued herein as DOES 1-20.  Plaintiff will amend this Complaint to allege the true names of the DOE defendants when he is able to ascertain them.

III.    **CLASS ACTION ALLEGATIONS**

17.    Plaintiff Escalera brings this action on behalf of himself and all others similarly situated (the "Proposed Class") pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3).  The Proposed Class is defined as follows:

> All natural persons employed by Defendants or their wholly owned subsidiaries, in the United States, at any time from the start of the conspiracy (no later than 2009) to the present.  Excluded from the class are senior executives and personnel in the human resources, recruiting, and legal departments of the Defendants, and employees hired outside of the United States to work outside of the United States.

18.    Plaintiff does not, as yet, know the exact size of the Proposed Class because such information is in the exclusive control of Defendants and their co-conspirators.  Upon information and belief, based upon the nature of the trade and commerce involved, and the reported numbers of total employees worldwide, there are thousands of Class members.  Joinder of all members of the Class, therefore, is not practicable.

19.    The questions of law or fact common to the Class include but are not limited to:

a.    whether Defendants' conduct has violated the Sherman Act;

b.    whether Defendants' Conspiracy and associated agreements, or any one of them, constitute a *per se* violation of the Sherman Act;

c.    whether Defendants have fraudulently concealed their misconduct;

d.    whether Defendants' Conspiracy and associated agreements have restrained trade, commerce, or competition for skilled labor among Defendants and their co-conspirators;

e.    whether Plaintiff and the Proposed Class have suffered antitrust injury or have been threatened with injury;

- 5 -

f.    the difference between the total compensation Plaintiff and the Proposed Class received from Defendants and their co-conspirators, and the total compensation Plaintiff and the Class would have received from Defendants and their co-conspirators in the absence of the illegal acts, contracts, combinations, and conspiracy alleged herein; and

g.    the type and measure of damages suffered by Plaintiff and the Proposed Class.

20.    These and other questions of law and fact are common to the Proposed Class, and predominate over any questions affecting only individual members of the Proposed Class.

21.    Plaintiff's claims are typical of the claims of the Proposed Class.

22.    Plaintiff will fairly and adequately represent the interests of the Proposed Class and has no conflict with the interests of the Proposed Class.

23.    Plaintiff has retained counsel experienced in antitrust and class action litigation to represent himself and the Proposed Class.

24.    Defendants and their co-conspirators have acted on grounds generally applicable to the Proposed Class, thereby making final injunctive relief appropriate with respect to the Proposed Class as a whole.

25.    This class action is superior to the alternatives, if any, for the fair and efficient adjudication of this controversy.  Prosecution as a class action will eliminate the possibility of repetitive litigation.  There will be no material difficulty in the management of this action as a class action.  By contrast, prosecution of separate actions by individual members of the Proposed Class would create the risk of inconsistent or varying adjudications, and be inefficient and burdensome to the parties and the Court.

1607824.1

IV.    **FACTUAL ALLEGATIONS**

A.    **Trade and Commerce**

26.    During the relevant time period, Defendants and their co-conspirators employed members of the Proposed Class, including in this judicial district.

27.    Conduct by Defendants and their co-conspirators has substantially affected interstate commerce throughout the United States, and has caused antitrust injury throughout the United States.

B.    **Competition for Employees in the Rail Industry**

28.    Knorr and Wabtec are the world's two largest rail equipment suppliers and each other's top rival in the development, manufacture, and sale of equipment used in freight and passenger rail applications.  Until its acquisition by Wabtec in 2016, Faiveley was the world's third largest supplier.

29.    Defendants are some of the largest employers in the rail industry.  For example, by the end of 2017, Wabtec and its subsidiaries employed approximately 18,000 full-time employees worldwide.  In 2016, it added approximately 5,700 employees through the acquisition of Faiveley.  By the end of 2017, Knorr and its subsidiaries employed approximately 27,700 employees worldwide, including approximately 5,000 employees in the Americas.

30.    Defendants have competed and continue to compete with one another and with firms at other tiers of the rail industry supply chain to attract, hire, and retain skilled employees by offering attractive salaries, benefits, training, advancement opportunities, and other favorable terms of employment.

31.    There is high demand for and limited supply of skilled employees who have rail industry experience.  As a result, firms in the rail industry can experience vacancies of critical

- 7 -

roles for months while they try to recruit and hire an individual with the requisite skills, training, and experience for a job opening.  Employees of other rail industry participants, including the employees of Defendants' customers, competitors, and suppliers, are key sources of potential talent to fill these openings.

32.     Firms in the rail industry employ a variety of recruiting techniques, including using internal and external recruiters to identify, solicit, recruit, and otherwise help hire potential employees.  Rail companies also receive direct applications from individuals interested in potential employment opportunities.

33.     Directly soliciting employees from another rail industry participant is a particularly efficient and effective method of competing for qualified employees.  Soliciting involves communicating directly—whether by phone, e-mail, social and electronic networking, or in person—with another firm's employee who has not otherwise applied for a job opening.  Such direct solicitation can be performed by individuals of the company seeking to fill the position or by outside recruiters retained to identify potential employees on the company's behalf.  Firms in the rail industry rely on direct solicitation of employees of other rail companies because those individuals have the specialized skills necessary and may be unresponsive to other methods of recruiting.  In addition, the rail industry is an insular one in which employees at different firms form long-term relationships and often look to their professional networks to fill a vacancy.

34.     In a properly functioning and lawfully competitive labor market, rail industry employers compete with one another to attract highly-skilled talent for their employment needs, so-called lateral hiring.  This competition benefits employees because it increases the available

job opportunities that employees learn about.  It also improves an employee's ability to negotiate for a better salary and other terms of employment.

35.    Through lateral hiring, one company is able to take advantage of the efforts its rival has expended in soliciting, interviewing, and training skilled labor, while simultaneously inflicting a cost on the rival by removing an employee on whom the rival may depend.  By contrast, hiring employees directly out of a training program comes with none of those benefits, and the hiring institution must invest significant resources into identifying, assessing, and training new employees.  For these reasons and others, lateral hiring is a key form of competition, particularly for highly trained and highly skilled workers.

36.    Competition for workers via lateral hiring has a significant impact on compensation in a variety of ways.  First, when employers become aware of attractive outside opportunities for their employees, the threat of losing employees to competitors encourages employers to preemptively increase compensation to increase morale and competitive positioning, and ultimately to retain valuable employees.  If employers do not react to competition, their employees may seek positions that offer more generous compensation and benefits elsewhere, or may be receptive to recruiting by a rival employer.  Once an employee has received an offer from a rival, retaining the employee may require a disruptive increase in compensation for one individual, if retention is possible at all.  Employers therefore have an incentive to preempt lateral departures by paying all employees well enough that they are unlikely to seek or pursue outside opportunities.  Preemptive retention measures thus lead to increased compensation for all employees.

37.    Second, the availability of desirable positions at competing employers forces employers to reactively increase compensation to retain employees who are likely to join a

competitor.  This can occur both when a particular employee or group of employees becomes interested in switching employers and the current employer responds by offering a compensation increase to retain them, or when an employer responds to overall attrition rates among its employees by increasing compensation levels.  In the former case, even a targeted increase designed to retain specific employees may put upward pressure on the entire compensation structure.

38.    Third, because many rail industry workers are highly specialized and integrated into teams tied to specific functions, some workers who move to positions at different companies may often bring with them others from their teams.  Just as competition forces employers to preemptively raise compensation to retain employees who might otherwise seek employment elsewhere, it also encourages increased compensation for related workers.  Thus, increased movement of one category of employee not only increases the compensation for those employees, but also for the categories of employees who are likely to also seek parallel lateral positions, with similar higher compensation and benefits.

39.    The positive compensation effects of hiring employees from competitors are not limited to the particular individuals who seek new employment, or to the particular individuals who would have pursued new positions but for the anticompetitive agreements alleged herein. Instead, the effects of hiring from competitors (and the effects of eliminating lateral hiring, pursuant to agreement) commonly impact all employees of the participating companies.

40.    Defendants' Conspiracy restrained competition for employees and disrupted the normal bargaining and price-setting mechanisms that apply in the labor market.

C.    **Defendants and Their Co-Conspirators Entered Into Ongoing Agreements Not to Hire Each Other's Employees.**

41.    Over a period spanning several years, Wabtec, Knorr, and Faiveley entered into similar no-poach agreements with one another to eliminate competition between them for employees.  These agreements were executed and enforced by the companies' senior executives and reached several of the companies' U.S. subsidiaries.  The no-poach agreements were not reasonably necessary to any separate, legitimate business transaction or collaboration between the companies.

1.    **Wabtec – Knorr Agreements**

42.    Wabtec and Knorr entered into pervasive no-poach agreements that spanned multiple business units and jurisdictions.  Senior executives at the companies' global headquarters and their respective U.S. passenger and freight rail businesses entered into no-poach agreements that involved promises and commitments not to solicit or hire one another's employees.  These no-poach agreements restricted each company from soliciting current employees from the other's company.  At times, these agreements were implemented  as agreements not to hire current employees from one another without prior approval.

43.    Beginning no later than 2009, Wabtec's and Knorr Brake's most senior executives entered into an express no-poach agreement and then actively managed it with each other through direct communications.  For example, in a letter dated January 28, 2009, a director of Knorr Brake wrote to a senior executive at Wabtec's headquarters, "[Y]ou and I both agreed that our practice of not targeting each other's personnel is a prudent cause for both companies.  As you so accurately put it, 'we compete in the market.'"  Although the no-poach agreement was between Wabtec and Knorr's U.S. passenger rail subsidiary, it was well-known to senior executives at the parent companies, including top Knorr executives in Germany who were

- 11 -

included in key communications about the no-poach agreement. In furtherance of their agreement, Wabtec and Knorr Brake informed their outside recruiters not to solicit employees from the other company.

44.    In some instances, Wabtec and Knorr Brake's no-poach agreement foreclosed the consideration of an unsolicited applicant employed by Wabtec or Knorr Brake without prior approval of the other firm. For example, in a 2010 internal communication, a senior executive at Knorr Brake stated that he would not even consider a Wabtec candidate who applied to Knorr Brake without the permission of his counterpart at Wabtec.

45.    Wabtec and Knorr's no-poach agreements also reached the companies' U.S. freight rail businesses. In July 2012, for example, a senior executive at N.Y. Air Brake informed a human resources manager that he could not consider a Wabtec employee for a job opening due to the no-poach agreement between Wabtec and Knorr.

46.    Wabtec's and Knorr's senior executives actively policed potential breaches of their companies' no-poach agreements and directly communicated with one another to ensure adherence to the agreements. For example, in February 2016, a member of Knorr's executive board complained directly to an executive officer at Wabtec regarding an external recruiter who allegedly solicited a Knorr Brake employee for an opening at Wabtec. The Wabtec executive investigated the matter internally and reported back to Knorr that Wabtec's outside recruiter was responsible for the contact and that he had instructed the recruiter to terminate his activities with the candidate and refrain from soliciting Knorr employees going forward due to the existing no-poach agreement between the companies.

### 2.    __Knorr – Faiveley Agreement__

47.    Beginning no later than 2011, senior executives at Knorr Brake and Faiveley
North America reached an express no-poach agreement that involved promises and commitments
to contact one another before pursuing an employee of the other company.  In October 2011, a
senior executive at Knorr Brake explained in an e-mail to a high-level executive at Knorr that he
had a discussion with an executive at Faiveley's U.S. subsidiary that "resulted in an agreement
between us that we do not poach each other's employees.  We agreed to talk if there was one
trying to get a job[.]"  Executives at Knorr Brake and Faiveley's U.S. subsidiary actively
managed the agreement with each other through direct communications.

48.    In or about 2012, a senior executive at Knorr Brake discussed the companies' no-
poach agreement with an executive at Faiveley North America.  This discussion took place at a
trade show in Berlin, Germany.  Subsequently, the executives enforced the no-poach agreement
with each other through direct communications.  This no-poach agreement was known to other
senior executives at the companies, who directly communicated with one another to ensure
adherence to the agreement.  For example, in October 2012, executives at Faiveley North
America stated in an internal communication that they were required to contact Knorr Brake
before hiring a U.S. train brake engineer.

49.    The companies continued their no-poach agreement until at least 2015.  After
Wabtec announced its proposed acquisition of Faiveley in July 2015, a high-level Knorr
executive directed the company's recruiters in the United States and other jurisdictions to raid
Faiveley for high-potential employees.

3.    **Wabtec – Faiveley Agreement**

50.    Beginning no later than January 2014, senior executives at Wabtec Passenger Transit and Faiveley North America entered into a no-poach agreement in which the companies agreed not to hire each other's employees without prior notification to and approval from the other company.

51.    Wabtec Passenger Transit and Faiveley North America executives actively managed and enforced their agreement with each other through direct communications.  For example, in January 2014, Wabtec Passenger Transit executives refused to engage in hiring discussions with a U.S.-based project manager at Faiveley North America without first getting permission from Faiveley North America executives.  In an internal e-mail to his colleagues, a Wabtec Passenger Transit executive explained that the candidate "is a good guy, but I don't want to violate my own agreement with [Faiveley North America]."  Only after receiving permission from Faiveley North America did Wabtec Passenger Transit hire the project manager.  One month later, a Wabtec Passenger Transit senior executive informed his staff that hiring Faiveley North America's employees was "off the table" due to the agreement with Faiveley North America not to engage in hiring discussions with each other's employees without the other's prior approval.

52.    In July 2015, Wabtec and Faiveley publicly announced their intent to merge. Wabtec closed its acquisition of Faiveley on November 30, 2016.  Presently, Faiveley is a wholly-owned subsidiary of Wabtec.

D.    **The Agreement Among Defendants and Their Co-Conspirators Was Concealed From All Members of the Proposed Class, Including Plaintiff Escalera.**

53.    Defendants and their co-conspirators actively concealed their anticompetitive agreement from all members of the Proposed Class, including Plaintiff Escalera.

54.    During the relevant time period, Class members had no actual or constructive knowledge of the nature or existence of the Conspiracy.

55.    Defendants deliberately concealed their no-poach agreements and communications about those agreements by hiding the substance of the Conspiracy from public view and by affirmatively making misleading statements to the public.

56.    For example, Knorr's 2017 Annual Report refers to Wabtec as its "principal competitor." Knorr's Code of Conduct, which applies to all of its worldwide employees, required "the entire workforce . . . to observe the law." The Code of Conduct also states, in a section relating to antitrust laws, that Knorr is "committed to observing the regulations on fair competition. In particular, in order to avoid infringing anti-trust legislation, it is not permitted to conclude agreements with competitors on [i] prices, margins, costs, volumes, production performance, tendering, sales or other factors that influence the behavior of the company, [ii] non-competition, false tendering or [iii] apportionment out of customers, markets, areas, production programs etc."

57.    Similarly, Wabtec's 2017 Form 10-K identifies Knorr as a "principal competitor." Wabtec also reported that it has a "responsibility for conducting the Company's affairs according to the highest standards," including conducting "business activities within the laws of host countries in which the Company operates."

58.     In its annual reports from 2009 through at least 2015, Wabtec identified N.Y. Air Brake as a "principal overall OEM competitor[]," as well as a competitor for "locomotive, freight and passenger transit service and repair" in North America.  From 2009 through at least 2015, Wabtec identified Knorr and Faiveley as its "largest competitors for Brake and Transit products" outside North America.

59.     Wabtec Global Services also states in its Policies and Procedures, the following: "Wabtec recognizes that its employees are our most important asset and that the products and services that we provide to our customers are only as good as the employees who produce them. Therefore, it is in the best interest of Wabtec, its customers and its shareholders to maintain the most talented and motivated employees available.  It is our sincere belief that the key ingredient to developing and maintaining such a skilled and motivated workforce is the fair and equitable treatment of employees in the workplace.  We believe that each employee is entitled to respect as an individual.  We expect our employees to treat their fellow employees with the same respect and consideration that they would expect."

60.     The details of Defendants' Conspiracy have only recently come to light.  On April 3, 2018, following an investigation, the Antitrust Division of the U.S. Department of Justice ("DOJ") filed a civil complaint and a stipulated judgment against Knorr and Wabtec regarding the no-poach agreements.  In accordance with the stipulated judgment, Knorr and Wabtec agreed to end participation in the no-poach agreements, to ensure compliance with the judgment, and to cooperate with the DOJ in any investigation concerning any other no-poach agreements.

**E.      Defendants' Conspiracy Suppressed Wages of Plaintiff Escalera and the Proposed Class, and Suppressed Their Mobility.**

61.     Defendants are direct competitors for skilled rail industry employees, including project managers, engineers, sales executives, and corporate officers.  Defendants entered into

anticompetitive no-poach agreements that reduced competition in the labor markets in which they compete and, in doing so, disrupted the typical bargaining and negotiation between employees and employers that ordinarily would take place in these labor markets.

62.    Defendants' no-poach agreements were facially anticompetitive because they eliminated a significant form of competition to attract skilled labor in the U.S. rail industry. These agreements denied employees access to better job opportunities, restricted their mobility, and deprived them of competitively significant information that they could have used to negotiate for better terms of employment.

63.    Defendants' conspiracy was an ideal tool to suppress their employees' compensation.  Whereas agreements to fix specific and individual compensation packages would be hopelessly complex and impossible to monitor, implement, and police, eliminating entire categories of competition for skilled labor (that affected the compensation and mobility of all employees in a common and predictable fashion) was simple to implement and easy to enforce.

64.    Accordingly, Defendants' no-poach agreements constitute unreasonable restraints of trade that are *per se* unlawful under Section 1 of the Sherman Act, 15 U.S.C. § 1.

65.    Plaintiff and members of the Proposed Class were harmed by the Conspiracy alleged herein.  The reduction of competition and suppression of compensation and mobility had a cumulative effect on all members of the Proposed Class.

66.    Without this class action, Plaintiff and the Proposed Class have been and will be unable to obtain compensation for the harm they suffered, and Defendants and their co-conspirators will retain the benefits of their unlawful conspiracy.

1607824.1

## FIRST CLAIM FOR RELIEF
### (Violation Of The Sherman Act, § 1)

67.     Plaintiff Escalera, on behalf of himself and all others similarly situated, realleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs of this Complaint, and further alleges against Defendants Knorr, Knorr Brake, N.Y. Air Brake, Wabtec, Faiveley, and Faiveley North America, and each of them as follows.

68.     Defendants and their co-conspirators entered into and engaged in unlawful agreements in restraint of the trade and commerce described above in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.  Beginning no later than January 1, 2009 and continuing through the present, Defendants engaged in continuing trusts in restraint of trade and commerce in violation of Section 1 of the Sherman Act.

69.     Defendants' and their co-conspirators' agreements have included concerted action and undertakings among the Defendants with the purpose and effect of: (a) fixing the compensation of Plaintiff Escalera and the Class at artificially low levels; and (b) eliminating, to a substantial degree, competition among Defendants and their co-conspirators for certain rail industry employees.

70.     As a direct and proximate result of Defendants' and their co-conspirators' combinations and contracts to restrain trade and eliminate competition for certain rail industry employees, members of the Proposed Class have suffered injury to their property and have been deprived of the benefits of free and fair competition on the merits.

71.     The unlawful agreements between Defendants and their co-conspirators have had the following effects, among others:

- 18 -

1607824.1

      a.     competition among Defendants and their co-conspirators for skilled labor has been suppressed, restrained, and eliminated; and

      b.     Plaintiff and members of the Proposed Class have received lower compensation from Defendants and their co-conspirators than they otherwise would have received in the absence of Defendants' and their co-conspirators' unlawful agreements, and, as a result, have been injured in their property and have suffered damages in an amount according to proof at trial.

72.     The acts done by each Defendant and their co-conspirators as part of, and in furtherance of, their contracts, combinations or conspiracies were authorized, ordered, or done by their respective officers, directors, agents, employees, or representatives while actively engaged in the management of each Defendant's affairs.

73.     Defendants' and their co-conspirators' contracts, combinations and/or conspiracies are *per se* violations of Section 1 of the Sherman Act.

74.     Accordingly, Plaintiff and members of the Proposed Class seek three times their damages caused by Defendants' violations of Section 1 of the Sherman Act, the costs of bringing suit, reasonable attorneys' fees, a declaration that such agreement is unlawful, and a permanent injunction enjoining Defendants from ever again entering into similar agreements in violation of Section 1 of the Sherman Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that this Court enter judgment on his behalf and that of the Proposed Class by adjudging and decreeing that:

A.     This action may be maintained as a class action, with Plaintiff as the designated Class representative and his counsel as Class counsel;

1607824.1

B.      Defendants and their co-conspirators have engaged in a trust, contract, combination, or conspiracy in violation of Section 1 of the Sherman Act, and that Plaintiff and the members of the Proposed Class have been damaged and injured in their business and property as a result of this violation;

C.      The alleged combinations and conspiracy be adjudged and decreed to be a *per se* violation of the Sherman Act;

D.      Plaintiff and the members of the Proposed Class he represents recover threefold the damages determined to have been sustained by them as a result of the conduct of Defendants and their co-conspirators, complained of herein, and that judgment be entered against Defendants Knorr, Knorr Brake, N.Y. Air Brake, Wabtec, Faiveley, and Faiveley North America for the amount so determined;

E.      Judgment be entered against Defendants Knorr, Knorr Brake, N.Y. Air Brake, Wabtec, Faiveley, and Faiveley North America and in favor of Plaintiff and each member of the Proposed Class he represents, for restitution and disgorgement of ill-gotten gains as allowed by law and equity as determined to have been sustained by them, together with the costs of suit, including reasonable attorneys' fees;

F.      For prejudgment and post-judgment interest;

G.      For injunctive relief, declaring the no-hire agreement among Defendants and their co-conspirators unlawful and enjoining Defendants from enforcing the agreement or entering into similar agreements going forward;

H.      For equitable relief, including a judicial determination of the rights and responsibilities of the parties;

I.      For attorneys' fees;

- 20 -

J.     For costs of suit; and

K.     For such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a jury trial for all claims and issues so triable.

Dated: August 23, 2018                    Respectfully submitted,

 /s/ Roberta D. Liebenberg
Roberta D. Liebenberg (PA ID #31738)
Gerard A. Dever (PA ID #85291)
FINE, KAPLAN AND BLACK, R.P.C.
One South Broad Street, Suite 2300
Philadelphia, PA  19107
Telephone:  (215) 567-6565
Facsimile:  (215) 568-5872
rliebenberg@finekaplan.com
gdever@finekaplan.com

Richard M. Heimann (*pro hac vice* pending)
Kelly M. Dermody (*pro hac vice* pending)
Brendan P. Glackin (*pro hac vice* pending)
Dean M. Harvey (*pro hac vice* pending)
Lin Y. Chan (*pro hac vice* pending)
Michael K. Sheen (*pro hac vice* pending)
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Telephone:  (415) 956-1000
Facsimile:  (415) 956-1008
rheimann@lchb.com
kdermody@lchb.com
bglackin@lchb.com
dharvey@lchb.com
lchan@lchb.com
msheen@lchb.com

- 21 -

1607824.1

Linda P. Nussbaum (*pro hac vice* forthcoming)
NUSSBAUM LAW GROUP, P.C.
1211 Avenue of the Americas, 40th Floor
New York, NY 10036
Telephone:  (917) 438-9102
lnussbaum@nussbaumpc.com

Thomas G. Foley, Jr. (*pro hac vice* pending)
Robert A. Curtis (*pro hac vice* pending)
FOLEY BEZEK BEHLE & CURTIS, LLP
15 W. Carrillo Street
Santa Barbara, CA  93101
Telephone:  (805) 962-9495
Facsimile:  (805) 962-0722
tfoley@foleybezek.com
rcurtis@foleybezek.com

Richard E. Donahoo (*pro hac vice* pending)
Sarah L. Kokonas (*pro hac vice* pending)
Judith L. Camilleri (*pro hac vice* pending)
DONAHOO & ASSOCIATES, PC
440 W. First Street, Suite 101
Tustin, CA  92780
Telephone:  (714) 953-1010
Facsimile:  (714) 953-1777
rdonahoo@donahoo.com
skokonas@donahoo.com
jcamilleri@donahoo.com

*Counsel for Plaintiff and the Proposed Class*